UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Christopher Thurston,

    Plaintiff,

    v.                                                    Civil Action No. 5:13-cv-316

Andrew Pallito, Commissioner of the
Vermont Department of Corrections,
Scott Morley, Bob Arkley,

    Defendants.

## REPORT AND RECOMMENDATION
(Docs. 7, 13)

Plaintiff Christopher Thurston, a Vermont inmate proceeding *pro se*, brings this suit under 42 U.S.C. § 1983 alleging that Vermont Department of Corrections (DOC) officials confiscated his journal and disciplined him for thoughts expressed in the journal by placing him in a lockdown unit for 64 days. (Doc. 4 at 1–2.) Thurston seeks the return of his journal and, for his "mental anguish," $250 per day for each of the 64 days he spent in lockdown. (*Id.* at 4.) On February 18, 2014, Defendant DOC Commissioner Andrew Pallito filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing, among other things, that he is immune, lacks personal involvement, and that Thurston has not alleged any physical injury or a violation of any federal right. (Doc. 7.) On April 10, 2014, Defendants Morley and Arkley filed a similar Motion to Dismiss. (Doc. 13.) Thurston has filed separate Responses to both Motions. (Docs. 12, 14.)

For the reasons that follow, I recommend that Defendants' Motions to Dismiss (Docs. 7, 13) be GRANTED and that Thurston be granted leave to amend. I further recommend that the court await Thurston's decision as to whether to file an Amended Complaint before addressing any state-law claims that Thurston might be asserting.

## Factual Background

The factual allegations in the Complaint are quite sparse and can be briefly stated. Thurston was incarcerated in September 2012. Mental health services gave him a composition book and asked him to write his thoughts in it. During a July 18, 2013 cell search, Supervisor Bob Arkley confiscated the journal. Arkley and another DOC officer, Scott Morley, then questioned Thurston about his journal. When Thurston failed to give "satisfactory answers," he was placed in a lockdown unit, where he spent 64 days. (Doc. 4 at 2.) DOC officers also confiscated the addresses of several of Thurston's friends. The DOC has not returned the journal or the addresses to Thurston, or even a photocopy of either. According to Thurston, nothing written in his journal constitutes contraband.[1]

## Analysis

**I.     Rule 12(b)(6) Standard and Applicable Law**

To survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a)(2). In *Iqbal*, the Supreme Court articulated the

---

[1] Since the journal has been confiscated, Thurston has obviously not been able to attach a copy of it (or any portion of it) to his Complaint.

"two-pronged" approach for analyzing a motion to dismiss. 556 U.S. at 679. First, a court must accept a plaintiff's factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor. *Id.* at 678. Second, a court must determine whether the complaint's "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief." *Id.* at 679. Determining whether a complaint states a plausible claim is a "context-specific task," but generally "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678–79.

Courts must "liberally construe pleadings and briefs submitted by *pro se* litigants, reading such submissions 'to raise the strongest arguments they suggest.'" *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (citations omitted) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). "Nonetheless, a *pro se* complaint must state a plausible claim for relief." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013).

Federal law provides a civil claim for damages against "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165

F.3d 137, 142 (2d Cir. 1999). "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right." *Id.*

## II.    Sovereign Immunity

Defendants correctly argue that Thurston's § 1983 claims against them in their official capacities are barred by Vermont's sovereign immunity. The Eleventh Amendment bars suits in federal court by private citizens against a state, its agencies, or its officials unless the state has waived its immunity or Congress has properly abrogated that immunity by exercising its powers under the Fourteenth Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 97–100 (1984). Neither of the exceptions applies here; the State of Vermont has expressly retained its Eleventh Amendment immunity, *see* 12 V.S.A. § 5601(g), and Congress has not abrogated Vermont's immunity through enacting legislation, *see Quern v. Jordan*, 440 U.S. 332, 342 (1979) (holding 42 U.S.C. § 1983 does not abrogate states' Eleventh Amendment immunity). Accordingly, the portion of Thurston's claim that seeks money damages from Defendants in their official capacities should be DISMISSED.

The issue of immunity aside, *all* of Thurston's § 1983 claims against Defendants in their official capacities should be DISMISSED because an official of a state agency sued in his official capacity is not a "person" under § 1983. *Huminski v. Corsones*, 396 F.3d 53, 70 (2d Cir. 2005). The remaining discussion therefore focuses on Thurston's claims against Defendants in their individual capacities.

### III. PLRA's Limitation on Recovery of Compensatory Damages

Under the Prison Litigation Reform Act (PLRA), "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ." 42 U.S.C. § 1997e(e). Here, Thurston alleges that he suffered "mental anguish" (Doc. 4 at 4), but as Defendants point out, Thurston does not allege in his Complaint that he suffered any physical injury as a result of the confiscation of his journal or the 64 days he spent in lockdown.[2] In the absence of a claim of physical injury, any claim for compensatory damages is barred under the PLRA. That conclusion does not, however, bar Thurston from recovering nominal and punitive damages, *see Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002), or from obtaining injunctive or declaratory relief, *see Davis v. Dist. of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998). Additional analysis is therefore necessary.

### IV. Personal Involvement—Commissioner Pallito

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) (quoting *Colon v. Coughlin*, 48 F.3d 865, 873 (2d Cir. 1995)). In order to obtain damages against an individual under § 1983, a

---

[2] In his Response to Pallito's Motion, Thurston alleges that he did suffer physical injury as a result of being placed on administrative segregation because he was not allowed to self-inject his insulin shots there. (Doc. 12 at 2.) According to Thurston, he refused to allow staff to inject the insulin, and as a result ended up being hospitalized. (*Id.*) The court cannot consider those representations in the present procedural context. *See Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 202 (2d Cir. 2013) ("We do not consider matters outside the pleadings in deciding a motion to dismiss for failure to state a claim."). In any case, Thurston has failed to state a claim for other reasons discussed below.

5

plaintiff must show some "tangible connection" between the constitutional violation alleged and that particular defendant. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

As the DOC Commissioner, Pallito sits atop the prison hierarchy, but that is insufficient to constitute personal involvement. *Colon*, 48 F.3d at 874. Neither can Pallito be responsible for Arkley and Morley's alleged wrongs on a respondeat superior theory. *See Bass*, 790 F.2d at 263 ("[R]espondeat superior liability does not lie against corrections officers in Section 1983 actions."). There is no allegation that Pallito directly participated in the alleged constitutional violation. Indeed, the Complaint contains no allegation that Pallito was personally involved in the July 18, 2013 cell search, the confiscation of the journal or the addresses, or Thurston's placement in lockdown.

Of course, supervisory officials like Pallito can be liable under some circumstances even without directly participating in the alleged violation. Indeed, personal involvement can be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 48 F.3d at 873. The Complaint in this case contains no allegations that would support any of the *Colon* avenues for supervisory liability as to Pallito.[3] Accordingly, Thurston has failed to state a § 1983 claim for money damages against Pallito.

That conclusion does not preclude Thurston from seeking injunctive relief—namely, the return of the journal. *See Koehl v. Dalsheim*, 85 F.3d 86, 89 (2d Cir. 1996) (monetary claim against prison superintendent in his individual capacity failed for lack of personal involvement, but injunctive relief was potentially available); *Justice v. Hulihan*, No. 9:11-cv-419 (GLS/DEP), 2013 WL 5506326, at *4 (N.D.N.Y. Oct. 4, 2013) ("'[W]hile a plaintiff may not pursue money damages against an individual defendant who lacks personal involvement with the underlying offense, that does not preclude a plaintiff from seeking prospective, injunctive [or declaratory] relief against the same defendant.'" (quoting *Bodie v. Morgenthau*, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004))). It is therefore necessary to proceed to Defendants' argument that Thurston has failed to allege a violation of federal rights—a requisite element of any § 1983 claim.

## V. Failure to Allege a Violation of Federal Rights

"Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). In other words, some of the constitutional rights of prisoners are "restricted by valid penological objectives." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). Nevertheless, "many

---

[3] This conclusion obviates any need to analyze whether the Supreme Court's decision in *Iqbal* abrogated any of the *Colon* categories of supervisor liability.

constitutional guarantees survive incarceration." *Id.* The issue here is whether the Complaint alleges a violation of any of Thurston's surviving constitutional rights.

### A. Fourth Amendment

Thurston asserts that his Fourth Amendment rights were violated because his journal was read by persons other than a mental health professional. (Doc. 12 at 1.) Prior to the Supreme Court's decision in *Hudson v. Palmer*, 468 U.S. 517 (1984), such a claim might have had some merit, at least depending on the circumstances. Indeed, in *DiGuiseppe v. Ward*, the Second Circuit applied the Fourth Amendment's "reasonableness" test to the reading and seizure of an inmate's diary. *DiGuiseppe v. Ward*, 698 F.2d 602, 605 (2d Cir. 1983). In that case, a prison riot had recently ended, there was a need to secure missing items, and all cells were required to be "completely frisked." *Id.* One of the officers conducting the search of DiGuiseppe's cell examined DiGuiseppe's diary, noted an entry with the same date as the riot, and read what DiGuiseppe had written. *Id.* at 604. The entry contained a statement that DiGuiseppe had "jerked the phone out of the wall." *Id.* DiGuiseppe ultimately received a sanction of "sixty days keeplock" for his misbehavior with the telephone. *Id.*

The Second Circuit held that, under the circumstances, the reading and seizure of DiGuiseppe's diary was reasonable. *Id.* at 605. The court noted the recent serious riot, the need to secure all contraband with thorough searches, and the importance of identifying the ringleaders of the riot. *Id.* The court also suggested that the intrusion was relatively minimal, observing that there was no indication that the officer read any portions of the diary that were unrelated to the riot. *Id.* Although the court ultimately

8

concluded that the search and seizure of the diary was legal in that case, the possibility that other searches and seizures of journals might violate the Fourth Amendment was arguably left open.

Any such possibility, however, was short-lived. In 1984, the Supreme Court decided *Hudson v. Palmer*, 468 U.S. 517. In *Hudson*, an inmate challenged a "shakedown" search of his cell, alleging that the search was conducted solely to harass him. The Supreme Court rejected the challenge, and held that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and . . . , accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Id.* at 526. While that holding may not apply to pretrial detainees, it remains the law with respect to convicted prisoners like Thurston. *See Willis v. Artuz*, 301 F.3d 65, 68–69 (2d Cir. 2002) (discussing *United States v. Cohen*, 796 F.2d 20 (2d Cir. 1986)). Thurston has therefore failed to allege a violation of the Fourth Amendment.

### B. First Amendment
#### 1. Thought and Expression

Thurston's Complaint includes the Orwellian allegation that the DOC punished him for his thoughts as expressed in his journal. Defendants argue that because the information in Thurston's journal was written down and not intended to be disclosed, the First Amendment analysis does not apply. In support, Defendants rely upon the *DiGuiseppe* case. In *DiGuiseppe*, the Second Circuit concluded that DiGuiseppe's claim—that the reading of his diary violated his right of privacy—"must be viewed in the

9

light of the Fourth Amendment rather than the First." *DiGuiseppe*, 698 F.2d at 605.  The court observed that DiGuiseppe "does not contend that the contents of his diary were intended to be disseminated or published," and that the search "did not impinge, therefore, upon plaintiff's right to speak, nor, of course, upon his right to listen, to believe, or to associate." *Id.*  Noting that "'freedom from censorship is not equivalent to freedom from inspection or perusal,'" the court proceeded to conduct the Fourth Amendment analysis described above. *Id.* (quoting *Wolff v. McDonnell*, 418 U.S. 539, 576 (1974)).

*DiGuiseppe* does not stand for the proposition that no First Amendment protections attach to an inmate's journal, even if the journal is not intended to be disseminated or published.  The claim in that case was that the search and seizure of the journal violated DiGuiseppe's right of privacy.  Thurston makes a similar claim in this case—although, for the reasons described above, that claim must fail.  But Thurston also claims that he was punished for his thoughts as expressed in his journal.  That is a different claim that was not at issue in *DiGuiseppe*.[4]

The First Amendment protects "the right of freedom of thought." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  That right must necessarily survive incarceration.  The DOC cannot punish inmates for their unexpressed thoughts. *See Stanley v. Georgia*, 394 U.S. 557, 565–66 (1969) (noting that "the power to control men's minds" is "wholly inconsistent with the philosophy of the First Amendment").  Once Thurston committed his thoughts to paper, however, he could no longer expect any privacy with regard to

---

[4] Unfortunately, Defendants' First Amendment legal analysis ends with the *DiGuiseppe* case.

what he had written.  Even so, if what Thurston wrote was protected speech, then it would be a violation of the First Amendment for the DOC to retaliate against him for writing it.  *See Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (reciting elements of a First Amendment retaliation claim).

Here, the Complaint does not hint at what was written in Thurston's journal that prompted the DOC officers to take action.  Of course, *DiGuiseppe* demonstrates that the contents of the journal do not themselves need to be contraband for the prison authorities to take action.  In *DiGuiseppe*, the prisoner's journal contained an admission to prohibited conduct.  The admission itself was not contraband, but it could be the basis for an investigation and evidence in a disciplinary proceeding.  Any punishment would not have been for DiGuiseppe's writing, per se, but rather for his misbehavior.

Here, according to the Complaint, Thurston was not punished for some *conduct* recounted in the journal, but rather for his "thoughts" as expressed in the journal.  (Doc. 4 at 2.)  At the Complaint's level of generality, it is possible that Thurston was punished for protected speech.[5]  But the opposite is also true: even though Thurston asserts that nothing in the journal constitutes contraband, that conclusory assertion is insufficient. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The Rule 12(b)(6) standard "asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  At this

---

[5] Drawing that line can sometimes be difficult.  *See Gomes v. Fair*, 738 F.2d 517, 528 (1st Cir. 1984) (no evidence of any intent by prison authorities to thwart or limit prisoner's right to write poetry, but under the particular circumstances, sexually explicit poem delivered by male inmate to female prison staff member warranted the prisoner's reclassification and a hearing on a disciplinary charge).

11

point, Thurston's Complaint is "consistent with" a theory of liability, but "stops short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 545–46.  Looking only within the four corners of the Complaint, I conclude that Thurston has failed to state a First Amendment retaliation claim.[6]

### 2. Association

The Complaint also includes an allegation that DOC officers confiscated the addresses of several of Thurston's friends, thereby denying him "access to my people." (Doc. 4 at 3.)  I interpret this as a First Amendment freedom-of-association claim.  The Supreme Court has said that "freedom of association is among the rights least compatible with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003).  Still, when corrections authorities act to restrict an inmate's ability to associate with others, the action must be examined to determine whether it "bear[s] a rational relation to legitimate penological interests." *Id.* at 132 (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

Thurston's freedom-of-association claim is insufficient.  Under the Complaint as pleaded, it is *possible* that DOC officials confiscated Thurston's list of addresses without any rational relation to legitimate penological interests.  But such a possibility is not plausibility, and does not meet the Rule 12(b)(6) standard.  Accordingly, the court should conclude that Thurston has failed to state a First Amendment freedom-of-association claim.

---

[6] In their memorandums, Defendants and Thurston have each offered representations as to the content of the writing in the journal.  (*See* Doc. 7 at 10; Doc. 12 at 1; Doc. 13 at 9.)  It is improper to consider extra-pleading materials on a Rule 12(b)(6) motion.  *See Nakahata*, 723 F.3d at 202 ("We do not consider matters outside the pleadings in deciding a motion to dismiss for failure to state a claim.").

### C. Eighth Amendment

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Here, Thurston might be claiming that the 64 days he spent in lockdown amounted to cruel and unusual punishment. However, "[c]ases in which prisoners have challenged the conditions of administrative segregation are typically analyzed as due process challenges, and not as challenges brought under the Eighth Amendment." *Griffith v. Hofmann*, No. 2:05-CV-126, 2006 WL 2585074, at *6 (D. Vt. Aug. 24, 2006) (citing *Arce v. Walker*, 193 F.3d 329, 333–37 (2d Cir. 1998)). I therefore address any potential conditions-of-confinement issue in the Fourteenth Amendment discussion immediately below.

### D. Fourteenth Amendment

"'The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake.'" *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012) (per curiam) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)).

#### 1. Liberty—Procedural Safeguards

"Due process requires that prior to the imposition of disciplinary segregation, an inmate be afforded various procedural safeguards, including notice, pre-hearing assistance, a fair and impartial hearing officer, a reasonable opportunity to call witnesses and present documentary evidence, a written disposition, and a sentence supported by some reliable evidence." *Mitchell v. Senkowski*, 158 F. App'x 346, 349 (2d Cir. 2005)

13

(citations omitted).  To the extent that Thurston might be arguing that he was placed in lockdown without the benefit of those safeguards, the Complaint contains no allegations on that issue.  The court should accordingly conclude that he has failed to state a due process claim for failure to provide adequate procedural safeguards prior to the imposition of the 64-day lockdown sentence.

### 2. Liberty—Conditions of Confinement

"A prisoner's liberty interest is implicated by prison discipline, such as SHU [special housing unit] confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life . . . .'"  *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).  As to whether confinement in a special housing unit constitutes an "atypical and significant hardship," the court must look to both the duration and the conditions of confinement.  *Ortiz v. McBride*, 323 F.3d 191, 195 (2d Cir. 2003) (per curiam).  "Where the plaintiff was confined for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions is required."  *Palmer*, 364 F.3d at 64–65 (quoting *Colon v. Howard*, 215 F.3d 227, 232 (2d Cir. 2000)).

> SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* [*v. Giltner*, 197 F.3d 578 (2d Cir. 1999)] or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical.

*Id.* at 65 (citations omitted).  Thus a confinement of less than 77 days is "not long enough to constitute an atypical and significant deprivation by itself."  *Id.* at 66.

14

Here, Thurston alleges that he was segregated for 64 days.[7] There are no allegations at all in the Complaint regarding the conditions of confinement. At least one court has held that a similar complaint would survive a motion to dismiss. *See Gillard .v Rovelli*, No. 9:12-CV-0083 (LEK/CFH), 2013 WL 5503317, at *3 (N.D.N.Y. Sept. 30, 2013) (declining to dismiss *pro se* conditions-of-confinement due process claim arising out of 90-day keeplock, notwithstanding the fact that the plaintiff failed to allege non-durational facts suggesting atypicality). For the reasons below, however, *Gillard* is not persuasive.

It is true that courts are obligated to construe the pleadings of a *pro se* plaintiff liberally. *See Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). As noted above, however, a *pro se* plaintiff is not relieved of the obligation to state a plausible claim for relief. *See Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). Without *any* allegation that the conditions Thurston experienced in lockdown were more severe than normal lockdown conditions, he has not stated a plausible claim. *See Self v. LaValley*, No. 9:10-CV-1463 (GTS/TWD), 2012 WL 7810950, at *12 (N.D.N.Y. Dec. 27, 2012) (recommending dismissal of due process claim arising out of 90-day keeplock because the plaintiff had not alleged that the conditions were more severe than normal SHU conditions), *adopted*, 2013 WL 1294448 (N.D.N.Y. Mar. 27, 2013). I accordingly

---

[7] In his Response to Morley and Arkely's Motion, Thurston states that, because of what he wrote in his journal, he has been in administrative segregation "repeatedly" since the July 18, 2013 cell search—for a total of 242 days as of April 15, 2014. (Doc. 14 at 1.) The court cannot consider those representations in the present procedural context.

recommend that the court dismiss—with leave to amend—any due process claim Thurston might be alleging regarding the conditions of his confinement in lockdown.

### 3. Property—Seizure of the Journal

Prisoners retain certain property interests despite being incarcerated. *See Hudson*, 468 U.S. at 530 (prison attendants cannot "ride roughshod over inmates' property rights with impunity"). DOC policy specifically allows prisoners to possess a certain quantity of "[p]aper materials including, but not limited to, books, magazines, newspapers, and correspondence." State of Vermont, Agency of Human Services, Department of Corrections, "Offender/Inmate Property" #321.01 (2010), at 7, *available at* http://www.doc.state.vt.us/about/policies/rpd/correctional-services-301-550/301-335-facilities-general/321-01-offender-inmate-property. However, "[p]rison officials must be free to seize from cells any articles which, in their view, disserve legitimate institutional interests." *Hudson*, 468 U.S. at 528 n.8. Authorized property deprivations are permissible when they are "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

According to Thurston, the physical journal itself is not contraband. His Complaint alleges that the physical journal is a composition book that was given to him by mental health services. Defendants do not assert that Thurston's possession of the journal was wrongful from the outset. *Cf. Gardner v. Johnson*, 492 F. Supp. 432, 434 (D. Mich. 1977) (seizure of diary was proper because the physical diary was a standard desk diary belonging to the prison that was not distributed to inmates and was considered

16

contraband).  Rather, Defendants maintain that the journal was confiscated because of what Thurston wrote in it after he obtained it.

It is possible that DOC seized the journal as evidence to be used in a disciplinary hearing.  If that is the case, then it is also possible that Thurston is entitled to the return of the journal.  DOC policy contemplates that property constituting disciplinary report evidence such as the journal in this case[8] should "be disposed of or destroyed" unless it can be "returned to the rightful owner."  State of Vermont, Agency of Human Services, Department of Corrections, "Interim Procedure on Contraband Classification and Disposition" (2006), at 3, *available at* http://doc.vermont.gov/about/policies/rpd/interim-and-memo/Interim%20Procedure%20Contraband.3.18.06.pdf.  Here, it seems reasonable to infer that any disciplinary hearing arising out of the July 18, 2013 cell search has already concluded.  If the journal is not itself contraband, then there would seem to be no impediment to returning it to Thurston.

However, it is also possible that the DOC seized the journal because it concluded that the journal inherently constitutes contraband by reason of what Thurston wrote in it.  As noted above, Thurston's allegation that the journal does not contain contraband is conclusory, and is insufficient for present purposes.  Without any indication as to what was written in the journal, or what determination (if any) DOC has made regarding its status as contraband, the court should conclude that Thurston's due process claim fails to cross the plausibility threshold.

---

[8] There are different disposition procedures for things like weapons, drugs, alcohol, money, tobacco, and hazardous items.

## VI.     Leave to Amend

The Second Circuit has cautioned that district courts should not dismiss *pro se* complaints with prejudice without granting leave to amend at least once "'when a liberal reading of the complaint gives any indication that a valid claim might be stated.'" *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (quoting *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991)); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should free give leave [to amend] when justice so requires."). Nonetheless, leave to amend may be denied in certain circumstances, including futility or "repeated failure to cure deficiencies by amendments previously allowed." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (internal quotation marks omitted).

Here, by adding more factual allegations, Thurston may be able to state a plausible § 1983 claim for the return of his journal and the addresses of his friends, or for other relief. The court should therefore grant him leave to amend. Any amended filing should be entitled "Amended Complaint" and should contain all claims against all parties as it will supersede the original Complaint in all respects. The court should require that any Amended Complaint be filed within 30 days of its ruling on this Report and Recommendation. Failure to so amend should result in dismissal with prejudice of all of Thurston's § 1983 claims.

## VII.    State-Law Claims

In his Complaint, Thurston alleges that he should be compensated for his "mental anguish"—arguably a state-law tort claim for intentional or negligent infliction of emotional distress. (Doc. 4 at 4.) In this case, the court should follow the approach taken

18

in *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 302 (S.D.N.Y. 2011), and await Thurston's decision as to whether to file an Amended Complaint. If Thurston fails to state a claim over which the court has original jurisdiction, then the court should decline to exercise supplemental jurisdiction over any state-law claims pursuant to 28 U.S.C. § 1367(c)(3). Conversely, if Thurston amends to successfully allege a federal cause of action, then it may be appropriate to address any state-law claims he might be asserting.

## Conclusion

For the reasons set forth above, I recommend that Defendants' Motions to Dismiss (Docs. 7, 13) be GRANTED. If the court adopts this Report and Recommendation, Thurston should be allowed 30 days to file an Amended Complaint. If Thurston fails to file an Amended Complaint, then all of Thurston's § 1983 claims should be DISMISSED. I recommend the court await Thurston's decision as to whether to file an Amended Complaint and, if he fails to do so, the court should decline to exercise supplemental jurisdiction over any state-law claims and DISMISS those claims without prejudice.

Dated at Burlington, in the District of Vermont, this 8th day of May, 2014.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation. *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).