UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Christopher Thurston,

       Plaintiff,

       v.                                                   Civil Action No. 5:13-cv-316

Andrew Pallito, Commissioner of the
Vermont Department of Corrections;
Scott Morley; Bob Arkley; Carl Davis;
Brian Reed; and Chris Mandigo,

       Defendants.

## REPORT AND RECOMMENDATION
(Doc. 30)

     Plaintiff Christopher Thurston, a Vermont inmate proceeding *pro se*, brings this

action under 42 U.S.C. § 1983 alleging that Vermont Department of Corrections (DOC)

officials wrongfully confiscated his mental health journal as contraband and disciplined

him for thoughts expressed in the journal. (*See* Doc. 4 at 2; Doc. 18 at 1.)[1] He further

asserts a variety of violations following the confiscation, including infirmities in the

disciplinary hearing and appeal process, improper transfer to another facility, and alleged

deprivations at that new facility. (*See* Doc. 18 at 3.) For relief, Thurston seeks the return

of his journal as well as compensatory and punitive damages. (*See* Doc. 4 at 4; Doc. 18

at 4.)

---

[1] As Defendants concede (Doc. 30 at 2), and as explained in more detail below, it is necessary to
consider the factual allegations in both Thurston's original Complaint (Doc. 4) as well as his Amended
Complaint (Doc. 18).

Currently pending is Defendants' Rule 12(b)(6) Motion to Dismiss for failure to state a claim.  (Doc. 30.)  For the reasons that follow, I recommend that Defendants' Motion to Dismiss (Doc. 30) be GRANTED, that Thurston's § 1983 claims against all Defendants be DISMISSED, and that any state-law claims Thurston is alleging against Defendants be DISMISSED without prejudice.

## Procedural History

Thurston filed his original Complaint on December 22, 2013, naming Andrew Pallito, Scott Morley, and Bob Arkley as Defendants.  (*See* Doc. 4.)  Those Defendants filed Motions to Dismiss (Docs. 7, 13), and in a Report and Recommendation (R&R) dated May 8, 2014, I recommended that the Motions to Dismiss be granted with leave to amend.  (Doc. 16.)[2]  On June 19, 2014, the District Court adopted the May 8, 2014 R&R in part (Doc. 19), noting that Thurston had already filed an Amended Complaint (Doc. 18).  The Amended Complaint includes additional factual allegations and adds three new Defendants: Carl Davis, Brian Reed, and Chris Mandigo.  All six Defendants now move to dismiss this action for failure to state a claim.  (Doc. 30.)  Thurston filed an Opposition on December 3, 2014.  (Doc. 34.)

## Background

I begin by briefly discussing what materials are referred to in compiling a statement of Thurston's factual allegations.  It is true that "an amended complaint ordinarily supersedes the original, and renders it of no legal effect."  *Dluhos v. Floating*

---

[2]  Familiarity with the May 8, 2014 R&R is presumed.

*& Abandoned Vessel*, 162 F.3d 63, 68 (2d Cir. 1998) (internal quotation marks omitted).

In this case, however, it is difficult to understand Thurston's factual allegations without

referencing both the original Complaint and the Amended Complaint. Defendants

concede that point. (*See* Doc. 30 at 2.)[3] I therefore conclude that that course is proper in

this case in light of Thurston's *pro se* status. *See Herbert v. Delta Airlines*, No. 12-CV-

01250 (SLT)(LB), 2014 WL 4923100, at *1 n.3 (E.D.N.Y. Sept. 30, 2014) (reading *pro

se* plaintiff's original and amended complaints together). Accordingly, Thurston's factual

allegations are as follows.

 Thurston was incarcerated in September 2012. Mental health services gave him a

composition book and asked him to write his thoughts in it. In July 2013 Thurston was

incarcerated at the Northern State Correctional Facility (NSCF) in Newport, Vermont.

During a July 18, 2013 cell search, NSCF Security Operations Supervisor Bob Arkley

confiscated the journal. Arkely and NSCF Security Operations Supervisor Scott Morley

then questioned Thurston about his journal. When Thurston failed to give "satisfactory

answers" to their questions, he was placed in a 23-hour-a-day lockdown unit. (Doc. 4 at

2.)

 DOC officers also confiscated the addresses of several of Thurston's friends. In

his original Complaint, Thurston alleges that "[t]hey" confiscated "several friends[']

address[es] which to this day they refuse to return to me. Even a photocopy, [and in] so

doing have denied me access to my people!" (Doc. 4 at 3.) In his Amended Complaint,

---

  [3] In his Opposition, Thurston indicates that he did not understand that the Amended Complaint
would supersede the original Complaint. (Doc. 34 at 1.)

Thurston asserts that he does not represent a threat to anyone in his address book.  (Doc.

18 at 4.)  He further asserts that NSCF Superintendent Carl Davis "asked me once where

I got some lawyer[']s address" and that he "should have answered – from my brother."

(*Id.*)

According to Thurston, his journal contains his "daily thoughts on dealing with

incarceration" and chronicles "the toughest year of my life."  (*Id.* at 2.)  Thurston

summarizes the relevant contents of the journal as follows:

> [I]t contains my rage when I felt mistreated by DOC staff.  The heartbreak
> of losing my wife, due to my incarceration, to another man.  My spiteful
> thoughts of killing them both, the rage and venom of a broken man.  The
> pain of 2 deaths, 2 longtime pets.  The pain of the ex-wife giving our dog
> away.  My 2 suicide attempts in Mar. of 2013, cussing myself out cause I
> couldn't get that right.  My vengeful thoughts of harming staff.  If I write
> that I want to gouge out a [corrections officer]'s eyeball, chew it up and spit
> it at him.  That's the mental health[] journal doing it[]s job.  I have no
> assault[]s on staff.
>
> Thoughts of how to make enough money to pay an attorney $10,000
> to do a post[-]conviction relief.  These thoughts generally are about how to
> introduce contraband to a facility.  At 2 dollars a day you can[]'t pay an
> attorney working a jail job.  The journal also contains a two[-]page start of
> a story, I was hoping to turn into a novel.  It was to be a shoot[-]em[-]up
> thriller as in Bonnie + Clyde.  The first scene is a jail break, where I use St.
> Johnsbury's design for the scene.

(*Id.*)  Thurston states that he wrote the jail break "story" in the first person.  (*Id.*)[4]

After the July 18, 2013 cell search and the confiscation of his journal, Thurston

received a hearing.  NSCF Department Supervisor Chris Mandigo was the hearing

officer.  Thurston states that he believes that Morley "instructed Mr. Mandigo to find in

---

[4]  Since the journal has been confiscated, Thurston obviously has not been able to attach a copy of
it (or any portion of it) to his Amended Complaint.

favor of ad[ministrative] seg[regation]." (*Id.* at 3.) Thurston also states that Arkley lied by stating in a report that Thurston "had on numerous occasions received drug[]s by having them thrown over the fence." (*Id.*) Thurston alleges that at the hearing, he asked Mandigo where in the journal it stated that he received drugs several times by having them thrown over the fence. According to Thurston, Mandigo did not examine the journal or take it into evidence, but only responded that, "[I]f Arkley say[]s it's there, it's there." (*Id.*) That, according to Thurston, proves that Mandigo failed to examine the evidence and that Mandigo was not impartial.

On an "Inmate Disciplinary Appeal Form" dated July 28, 2013, Thurston appealed his administrative segregation. (Doc. 18-1.) Thurston described the reasons for his appeal as follows:

> Mr. Thurston's due process was violated from the beginning, [from] his (SFI) classification to his Ad[ministrative] Seg[regation] hearing. If you review the record it will show plain error and Wiseman told me "do what's right" not what's right or wrong. Disabled people need a voice if they are not of sound mind to do so themselves.

(*Id.*)[5] The appeal form indicates that staff received the appeal on July 29, 2013. On an "Inmate Request Form" dated August 22, 2013 and addressed to NSCF Superintendent Carl Davis, Thurston wrote: "I am wondering what happened with my appeal? It was

---

[5] The "(SFI) classification" is a reference to Thurston's apparent designation as "severely functionally impaired." *See* 28 V.S.A. § 906(1) (defining serious functional impairment); *see also* State of Vermont, Agency of Human Services, Department of Corrections, "Facility Rules and Inmate Discipline," #410.01, at 5 (eff. May 1, 2012), *available at* http://www.doc.state.vt.us/about/policies/rpd/correctional-services-301-550/401-500-programs-security-and-supervision/410-01-facility-rules-and-inmate-discipline.pdf (defining an "SFI-designated Inmate" as "[a]n inmate designated by the Chief of Mental Health Services to be severely functionally impaired, based on an inmate's diagnosis and functioning during incarceration and the recommendation of DOC medical and mental health providers").

turned in 7-28-13. I still have not received it back yet?" (Doc. 18-2.) Davis responded on August 28, 2013, writing: "We do not have an appeal. I will have A.Supt. Hammond review your concern." (*Id.*)[6]

On September 6 or 7, 2013, Thurston was transferred to the Northwest State Correctional Facility (NWSCF) in Swanton, Vermont. (*See* Doc. 18 at 2.)[7] Thurston states that he believes Morley made the decision to transfer him without Superintendent Davis's knowledge or approval. According to Thurston, as a result of being transferred, he missed medical appointments that had been made for him in Newport, which caused more pain from a torn rotator cuff and a torn bicep tendon. (*Id.* at 3.)

Also according to Thurston, the NWSCF segregation unit put him in a "more severe than normal lock down." (*Id.* at 2.) Thurston states that, unlike the administrative segregation units in Newport and St. Johnsbury, at NWSCF he was not allowed to inject his own insulin. Thurston refused to allow a "stranger" to inject him at NWSCF. (*Id.*) After two days he began to vomit. He attempted to file an emergency grievance, but NWSCF Chief of Security Brian Reed claimed that it was not an emergency, and that he had 48 hours to respond to Thurston's grievance. According to Thurston, "[w]ithin that 48 [hours] I was in the emergency room, where I spent 3 days in [the] ICU." (*Id.* at 3.)

---

[6] Thurston supplies no specific allegations regarding whether Assistant Superintendent Hammond conducted any review or what the results might have been. Presumably Thurston's segregation was not reversed on administrative appeal.

[7] Thurston alleges that he was transferred to "St. Albans." (*Id.*) The closest Vermont correctional facility to St. Albans is NWSCF in Swanton, Vermont.

When he was returned from the hospital, Thurston was placed in a cell wearing just boxers.

Thurston states that he has been administratively segregated on three different times as a result of his journal, for a total of 268 days as of May 13, 2014.  (*Id.* at 3–4.) Neither his journal nor his address book has been returned to him.

<u>**Analysis**</u>

## I.      **Analytical Approach and Applicable Law**

### A.      **Rule 12(b)(6) Standard**

To survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a)(2).  In *Iqbal*, the Supreme Court articulated the "two-pronged" approach for analyzing a motion to dismiss.  556 U.S. at 679.  First, a court must accept a plaintiff's factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor.  *Id.* at 678.  Second, a court must determine whether the complaint's "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief."  *Id.* at 679.  Determining whether a complaint states a plausible claim is a "context-specific task," but generally "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678–79. "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter

of law.'" *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 208–09 (2d Cir. 2014) (per curiam) (quoting *Conopco, Inc. v. Roll Int'l*, 231 F.2d 82, 86 (2d Cir. 2000)).[8]

Courts must "liberally construe pleadings and briefs submitted by *pro se* litigants, reading such submissions 'to raise the strongest arguments they suggest.'" *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (citation omitted) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). "Nonetheless, a *pro se* complaint must state a plausible claim for relief." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013).

## B.    Section 1983

Federal law provides a civil claim for damages against "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right." *Id.*

---

[8] In this Report and Recommendation reference is made to several DOC regulations, all of which are proper subjects for judicial notice. *See* Fed. R. Evid. 210(b), (d); *see also Christman v. Skinner*, 468 F.2d 723, 726 (2d Cir. 1972) (explaining it is appropriate for district courts to take judicial notice of state prison rules and regulations).

## II.      Official-Capacity Claims

The addition of three new Defendants in the Amended Complaint does not change the sovereign immunity analysis set forth in the May 8, 2014 R&R.  Like the original three Defendants, the three new Defendants are all Vermont state employees. Accordingly, for the reasons set forth in the May 8, 2014 R&R (*see* Doc. 16 at 4), Thurston's § 1983 claims for money damages against them in their official capacities are barred by Vermont's sovereign immunity, and should be DISMISSED.  Moreover, all of Thurston's claims against all Defendants in their official capacities should be DISMISSED because an official of a state agency sued in his official capacity is not a "person" under § 1983.  (*See id.* (citing *Huminski v. Corsones*, 396 F.3d 53, 70 (2d Cir. 2005).)  The discussion that follows therefore focuses on Thurston's claims against Defendants in their individual capacities.

## III.     PLRA's Limitation on Recovery of Compensatory Damages

Under the Prison Litigation Reform Act (PLRA), "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ."  42 U.S.C. § 1997e(e).  Section 1997e(e) "applies to all federal civil actions including claims alleging constitutional violations."  *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002).  Section 1997e(e) "is a limitation on recovery of damages for mental and emotional injury in the absence of a showing of physical injury," so "it does not restrict a plaintiff's ability to recover compensatory damages for actual injury, nominal or punitive damages, or injunctive and declaratory relief."  *Id.*  The purpose of § 1997e(e) is

"to tie recovery for emotional injury to the existence of a corresponding physical injury," presumably on the theory that "the existence of a physical injury would distinguish meritorious prisoner claims of emotional injury from frivolous ones." *McGarry v. Pallito*, No. 1:09-cv-128, 2013 WL 3338682, at *5 n.6 (D. Vt. July 2, 2013) (internal quotation marks omitted).

Thurston seeks damages for alleged "mental anguish" he suffered while in segregation.  (*See* Doc. 4 at 4.)  Thus, the issue is whether Thurston has alleged any corresponding "physical injury" that might serve as a basis to which that alleged mental anguish could be tied.  Here, Thurston alleges two incidents that he apparently contends qualify as a sufficient "physical injury": pain allegedly stemming from missed medical appointments after his transfer to NWSCF, and a three-day hospitalization related to missed insulin injections.

Thurston alleges no details regarding the pain stemming from the missed medical appointments, so there is some question as to whether that factual allegation is greater than *de minimis*.  *See McGarry*, 2013 WL 3338682, at *7 (discussing injuries that are sufficient to constitute "physical injury" under the PLRA).  However, Thurston also alleges that, after he was transferred to NWSCF where he was not allowed to self-inject his insulin, he became sick and had to be hospitalized.  (Doc. 18 at 2–3.)  Giving Thurston the benefit of all reasonable inferences, Thurston's hospitalization (and three-day treatment in the ICU) for apparent symptoms resulting from missing his insulin treatment would likely constitute a "physical injury" under the PLRA.  *See Bowen v. Cnty. of Allegany*, No. 03-CV-272S, 2004 WL 1588213, at *1, 6 (W.D.N.Y. July 14,

2004) (diabetic plaintiff who did not receive his insulin injection and was hospitalized with symptoms of diabetic ketoacidosis and myocardial infarction had sufficiently alleged "serious physical injuries").

Defendants apparently do not dispute that Thurston suffered a physical injury. Instead, they argue that Thurston cannot show causation.  Specifically, Defendants argue that Thurston "has not alleged that he was transferred to a different correctional facility with different procedures regarding self-injection of insulin due to the confiscation of his mental health journal" and that Thurston's injury was "a result of his own refusal to take his insulin."  (Doc. 30 at 25.)

Initially, giving Thurston the benefit of all reasonable inferences, he does appear to be at least implicitly alleging that his transfer to NWSCF was part of Defendants' action against him for the contents of his journal.  Indeed, Thurston claims that Morley— the same officer who questioned him about his journal—unilaterally decided to transfer him.  (Doc. 18 at 3.)  And in his Opposition, Thurston explicitly asserts that his "transfer to [the] NWSCF close custody unit was a result of the seizure of my mental health journal."  (Doc. 34 at 10.)

To the extent that Thurston is alleging that his transfer to NWSCF and alleged mental anguish there was the result of retaliation against him for protected First Amendment speech in his journal, it is difficult to conclude at this stage that the PLRA bars recovery for emotional damages.  This court has previously suggested that the PLRA's bar on compensatory damages might not apply to First Amendment claims.  *See Byrne v. Trudell*, No. 1:12-cv-245-jgm-jmc, 2013 WL 2237820, at *26 n.28 (D. Vt. May

21, 2013) (citing cases).  Thus even if Thurston's physical injuries resulting from insulin deprivation were not causally tied to his alleged mental anguish, the PLRA would not necessarily bar compensatory damages for emotional distress arising out of the alleged First Amendment violation.

To the extent that Thurston is alleging that he suffered mental anguish because of constitutionally deficient conditions of confinement at NWSCF, the PLRA does require a corresponding physical injury.  Thurston says that his hospitalization proves the necessary physical injury.  As noted above, Defendants maintain that Thurston's physical injury was caused by his own refusal to take his insulin.  I analyze Defendants' argument on that point below; for the purposes of the PLRA analysis, however, I conclude that Thurston has alleged a physical injury resulting from his segregation at NWSCF.

Accordingly, the PLRA is not a basis for dismissing Thurston's alleged emotional injuries stemming from his placement in segregation.  Moreover, since the PLRA does not bar a plaintiff from recovering compensatory damages for actual injury, the PLRA is not a bar to Thurston's recovery of damages for any violation or deprivation that caused his hospitalization, his alleged shoulder and arm pain, or any other physical injury.  The PLRA also does not bar Thurston's claims for punitive damages or for injunctive relief.

## IV.   Personal Involvement

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).  In order to obtain damages against an individual under § 1983, a

plaintiff must show some "tangible connection" between the constitutional violation

alleged and that particular defendant.  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Personal involvement by supervisory officials can by shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 48 F.3d at 873.[9]

Here, Thurston's Amended Complaint includes no new factual allegations

regarding Commissioner Pallito.  Thurston concedes that Pallito was not directly

personally involved in any of the alleged conduct giving rise to Thurston's claims.  (*See*

Doc. 18 at 1 (asserting that only "five of the six defendants were directly personally

involved").)  However, in his Opposition, Thurston alleges that "[a]ll the defendants were

personally involved," and that Pallito was involved because he "has received several

appeals to the commissioner, as well as overseeing all of corrections."  (Doc. 34 at 1.)

Thurston further alleges that Pallito was personally involved because he "signed off" on

the 60-day review of Thurston's administrative segregation.  (*Id.* at 3.)

---

[9]  The court has previously recognized a disagreement within the Second Circuit as to whether the Supreme Court's decision in *Iqbal* abrogated any of the categories of supervisor liability.  *See Byrne*, 2013 WL 2237820, at *9 n.10.  In the absence of any Second Circuit decision specifically overruling *Colon*, this court has continued to treat *Colon* as good law.  *See id.*

As stated in the May 8, 2014 R&R, Commissioner Pallito's position at the top of the prison hierarchy is insufficient to constitute personal involvement.  (*See* Doc. 16 at 6.) On the other hand, Thurston alleges in his Opposition that Pallito "signed off" on a review of Thurston's segregation, and also received appeals from Thurston regarding the matters at issue here.  (*See* Doc. 34 at 1, 3.)  Those allegations are not properly pleaded, but might be a basis for granting leave to amend.  *See Grullon v. City of New Haven*, 720 F.3d 133, 140–41 (2d Cir. 2013) (district court erred in granting motion to dismiss without leave to amend because, where prisoner alleged that he sent the warden a letter, he was entitled to have the court draw the reasonable inference that the warden "received the Letter, read it, and thereby became aware of the alleged conditions of which Grullon complained").[10]  The issue of leave to amend is discussed *infra*.

I discuss the personal involvement of each of the remaining five Defendants below, each of whom seeks dismissal of some of Thurston's damages claims against them depending on the claim.[11]  This exercise is not case-dispositive, however, since each

---

[10]  On summary judgment, this court's pre-*Grullon* observation in *Thompson v. Pallito* might well apply to rule out personal involvement.  *See Thompson v. Pallito*, 949 F. Supp. 2d 558, 575 (D. Vt. 2013) ("The district courts of this circuit appear to be in unanimous agreement that a supervisory official having received (and ignored) a letter from an inmate alleging unconstitutional conduct does not, without more, give rise to personal involvement on the part of that official.").  In light of *Grullon*, that conclusion in *Thompson* must be applied with caution depending on the procedural posture.

[11]  Regarding Thurston's freedom-of-association claim, each Defendant asserts that Thurston has failed to allege personal involvement with respect to the alleged confiscation of his address book.  (Doc. 30 at 14.)  Thurston's factual allegations regarding his address book are sparse, but he does name Defendant Davis in his narrative on that topic.  In his Opposition, Thurston also explicitly asserts that Davis denied him his First Amendment right to association "by his repeated refusals to return my address [book] to me."  (Doc. 34 at 3.)  Ultimately, however, personal involvement in the address book confiscation is not particularly relevant because, as discussed below, Thurston has failed to allege a violation of federal rights.

14

of the remaining five Defendants appears to concede personal involvement in at least one of Thurston's claims, and because lack of personal involvement only precludes an award of damages, and in this case Thurston is also seeking injunctive relief.  (*See* Doc. 16 at 7.)

### A.    Bob Arkley

As described above, Thurston alleges that Arkley confiscated Thurston's journal. Thurston also alleges that Arkley lied in his report used at Thurston's segregation hearing.  To the extent that the latter conduct might give rise to any Fourteenth Amendment claim, Arkley apparently concedes personal involvement.  (*See* Doc. 30 at 9.)  In light of the above recommendation that the court read both the original Complaint and Amended Complaint together, I further recommend that the court reject Arkley's assertion (*id.*) that Thurston's apparent First Amendment retaliation claim against him has been superseded by the Amended Complaint.  However, since Thurston does not allege any facts suggesting that Arkley was personally involved in any conduct giving rise to a constitutional conditions-of-confinement claim,[12] Thurston cannot recover money damages against Arkley for any such claim.

---

[12]  Defendants appear to categorize any conditions-of-confinement claim as an Eighth Amendment claim.  However, as the May 8, 2014 R&R noted, "'[c]ases in which prisoners have challenged the conditions of administrative segregation are typically analyzed as due process challenges, and not as challenges brought under the Eighth Amendment.'"  (Doc. 16 at 3 (quoting *Griffith v. Hofmann*, No. 2:05-CV-126, 2006 WL 2585074, at *6 (D. Vt. Aug. 24, 2006).)  Here, it appears that Thurston is alleging both that his segregation imposed an atypical and significant hardship (a Fourteenth Amendment claim), and that his conditions of confinement were cruel and unusual (an Eighth Amendment claim).  For present purposes I categorize all such claims simply as conditions-of-confinement claims.

**B.    Scott Morley**

Thurston alleges that Morley questioned him about his journal after it was confiscated, and found Thurston's responses unsatisfactory.  Thurston also alleges that Morley instructed Mandigo to find in favor of administrative segregation, and decided to transfer Thurston to NWSCF without Superintendent Davis's knowledge or approval.  Like Arkley, Morley apparently concedes personal involvement in the events that Thurston claims give rise to a Fourteenth Amendment claim.  (*See* Doc. 30 at 9.)  Moreover, if the court reads both the original Complaint and Amended Complaint together, then the court should reject Morley's assertion (*id.*) that Thurston's apparent First Amendment retaliation claim against him has been superseded by the Amended Complaint.

**C.    Chris Mandigo**

Thurston's only allegations against Mandigo are that he failed to examine all of the evidence at Thurston's segregation hearing, and that he was not an impartial hearing officer.  Mandigo apparently concedes personal involvement in the events giving rise to those alleged Fourteenth Amendment claims.  (*See id.* at 8.)  Mandigo denies personal involvement in any First Amendment violation, but I conclude that he is at least arguably personally involved for failing to remedy the (alleged) wrong "after being informed of the violation through a report or appeal."  *Colon*, 48 F.3d at 873.  However, Thurston does not allege any facts suggesting that Mandigo was personally involved in any conditions-of-confinement violations, and Thurston cannot recover money damages from Mandigo for any such claims.

### D.    Carl Davis

Thurston's only explicit allegation against Superintendent Davis concerns Davis's response to Thurston's inquiry about the status of his administrative appeal.  (*See* Doc. 18 at 3 ("The request form sent to [S]uperintend[e]nt Carl Davis[] shows his personal involvement, when his response is we have no appeal from you.").)  Defendant Davis apparently concedes personal involvement in the events giving rise to an alleged Fourteenth Amendment claim.  (*See* Doc. 30 at 8.)  However, Thurston does not allege any facts suggesting that Davis was personally involved in any First Amendment or conditions-of-confinement violations, and Thurston cannot recover money damages from Davis for any such claims.[13]

### E.    Brian Reed

Thurston asserts that Reed failed to appropriately respond to Thurston's emergency grievance.  Since Reed is the only NWSCF official that Thurston names, Thurston's complaint about being placed in his cell at NWSCF in just boxer shorts appears to be directed against Reed as well.[14]  To the extent those are conditions-of-confinement claims, a liberal reading of the Amended Complaint suggests that Thurston is alleging that Reed was personally involved.  Thurston does not allege any facts

---

[13]   In his Opposition, Thurston does allege that Davis was informed of the alleged First Amendment and conditions-of-confinement violations because Davis was on the team that met weekly to review Thurston's administrative segregation.  (Doc. 34 at 3.)  At best that might be an argument for granting leave to amend—a topic I discuss below.

[14]   This is confirmed by Thurston's Opposition.  (*See* Doc. 34 at 3.)

suggesting that Reed was personally involved in any First Amendment violations, and Thurston cannot recover money damages from Reed for any such claims.

## V.     Failure to Allege a Violation of Federal Rights

For those claims that remain after all of the above winnowing, the next step in the § 1983 analysis is to ask whether Thurston alleged a violation of any federal rights. "Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner.  An inmate does not retain rights inconsistent with proper incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003).  In other words, some of the constitutional rights of prisoners are "restricted by valid penological objectives."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994).  Nevertheless, "many constitutional guarantees survive incarceration." *Id.*  Generally, the approach to balancing legitimate penological concerns against prisoners' constitutional rights is to evaluate whether a prison regulation is "reasonably related to legitimate penological interests."  *Turner v. Safley*, 482 U.S. 78, 89 (1987).  I begin by observing that nothing in Thurston's Amended Complaint alters the conclusion in the May 8, 2014 R&R that Thurston has failed to allege a violation of the Fourth Amendment.  (*See* Doc. 16 at 8–9.)

### A.     First Amendment—Thought and Expression; Retaliation

Thurston's Amended Complaint includes the Orwellian allegation that the DOC punished him for his thoughts as expressed in his journal.  The First Amendment protects "the right of freedom of thought."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  That right must necessarily survive incarceration.  The DOC cannot punish inmates for their unexpressed thoughts.  *See Stanley v. Georgia*, 394 U.S. 557, 565–66 (1969) (noting that

"the power to control men's minds" is "wholly inconsistent with the philosophy of the First Amendment"). Once Thurston committed his thoughts to paper, however, he could no longer expect any privacy with regard to what he had written. (*See* Doc. 16 at 8–9.) Even so, if what Thurston wrote was protected speech, then it would be a violation of the First Amendment for the DOC to retaliate against him for writing or possessing it.

> To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."

*Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)). "An inmate bears the burden of showing that 'the protected conduct was a substantial or motivating factor' in the prison officials' disciplinary decision." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)). "The defendant official then bears the burden of establishing that the disciplinary action would have occurred even absent the retaliatory motivation . . . ." *Id.* at 226 (internal quotation marks omitted).

Defendants argue that Thurston cannot prove the first element because the content of his journal is not protected speech. (Doc. 30 at 12.) Defendants also include some discussion regarding the second element. (*Id.* at 11.)[15] Finally, Defendants argue that

---

[15] I note that the Second Circuit has held that "[i]n the prison context, the harm could include such an adverse action as placing a plaintiff in keeplock for a period of weeks." *Gill*, 389 F.3d at 383. The harm could also include retaliatory transfer to another facility. *See Hendricks v. Coughlin*, 114 F.3d 390 (1997).

even if Thurston can establish a prima facie case for retaliation, security concerns

regarding written escape plans or threats against staff supplied the DOC with a legitimate

non-retaliatory reason for confiscating the journal and segregating Thurston.  (*Id.* at 13.)[16]

For the reasons discussed below, I conclude that Thurston cannot prove that the speech at

issue was protected, and I also conclude that restricting the speech is reasonably related

to legitimate penological interests.  I therefore do not reach Defendants' additional

arguments on Thurston's First Amendment retaliation claim.

Defendants argue that Thurston's writing regarding harming staff is not protected

speech because it constitutes a "true threat" as defined in *Virginia v. Black*, 538 U.S. 343

(2003).  (Doc. 30 at 12–13.)  As the Supreme Court explained in that case:

> "True threats" encompass those statements where the speaker means
> to communicate a serious expression of an intent to commit an act of
> unlawful violence to a particular individual or group of individuals.  The
> speaker need not actually intend to carry out the threat.  Rather, a
> prohibition on true threats protect[s] individuals from the fear of violence
> and from the disruption that fear engenders, in addition to protecting people
> from the possibility that the threatened violence will occur.  Intimidation in
> the constitutionally proscribable sense of the word is a type of true threat,
> where a speaker directs a threat to a person or group of persons with the
> intent of placing the victim in fear of bodily harm or death.

*Black*, 438 U.S. at 359–60 (alteration in original) (citations and internal quotation marks

omitted).  Whether a communication is a "true threat rather than speech protected by the

---

[16]  Defendants do not address whether it is appropriate to conduct such a burden-shifting analysis
in the context of a Rule 12(b)(6) motion to dismiss.

First Amendment" is a question of law for the court.  *United States v. Francis*, 164 F.3d 120, 123 n.4 (2d Cir. 1999).[17]

Here, the Amended Complaint indicates that Thurston's journal contained "vengeful thoughts" about harming staff.  Thurston describes one graphic example where he wrote about wanting to gouge out a corrections officer's eyeball.  I conclude that that constitutes a serious expression of an intent to commit an act of unlawful violence.  Since the speaker need not actually intend to carry out the threat, it is immaterial that Thurston alleges that he has never assaulted any staff member, and that he believes the writing is just the mental health journal doing its job.[18]

I further conclude that restricting speech about harming corrections staff is reasonably related to legitimate penological interests.  *See Turner*, 482 U.S. at 89–91 (discussing factors relevant to determining reasonableness of a prison regulation). There are multiple logical connections between restricting such speech and the legitimate goals of maintaining safety and security in the prison context, such as protecting corrections officers from fear of violence and helping to protect them from the possibility that such

---

[17] In cases involving prosecutions for crimes involving threatening communications, juries must decide the factual question of whether the government has proven the element that a reasonable person would interpret the communication as a true threat.  *See Francis*, 164 F.3d at 123 n.4.  That element is not at issue in this civil case.

[18] In cases involving questions about whether *students'* writing was protected speech, courts have asked "whether it was reasonably foreseeable for the student's communication to come to the attention of school authorities."  *TC v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 592 (S.D.N.Y. 2011).  In *TC*, a student was disciplined after being found in possession of certain song lyrics, but there was no indication that the student shared the objectionable lyrics, made them viewable to other students, or otherwise published them to classmates or teachers.  *Id.*  The court in that case accordingly concluded that the student had stated a claim for violation of his First Amendment rights.  Of course, the prison context is quite different, since prisoners have no expectation of privacy within their prison cells.

violence will occur.  To the extent that prisoners' thoughts about harming staff are motivated by dissatisfaction with treatment by prison staff, prisoners have a non-violent alternative: they may file grievances.  Permitting prisoners to express thoughts of harming staff would inject dangerous volatility into an already difficult environment. Finally, Thurston has not pointed to any alternative policy that would accommodate his First Amendment rights at a *de minimis* cost to valid penological objectives.[19]

The court in *Macy v. Ashby* reached the same conclusion under similar circumstances.  In that case, a corrections officer found the plaintiff's journal in his cell during a routine shakedown, and read the journal to determine what it was and whether it was permitted property.  No. 1:12-cv-00259-TWP-MJD, 2014 WL 3709593, at *1 (S.D. Ind. July 28, 2014).  The officer testified that the journal contained the prisoner's statement that he wanted to stab a correctional facility staff member.  *Id.*  The officer considered that statement to be a threat, and the prisoner's journal was confiscated as a threat to the facility's security and because it threatened staff with violence.  *Id.*  The prisoner, Macy, attempted to dispute the officer's description of the contents of his journal—asserting that he used the journal as a personal rehabilitative tool and that it did not contain threats but only observations that if certain conduct by staff continued then more staff injuries would occur.  *Id.* at *1 n.1.

---

[19]  Notably, and consistent with this analysis, DOC regulations make it a disciplinary violation for inmates to "[t]hreaten[] another with harm, bodily injury or an act with adverse consequences for any reason."  *See* State of Vermont, Agency of Human Services Department of Corrections, "Facility Rules and Inmate Discipline," #410.01 at 20 (eff. May 1, 2012), *available at* http://doc.vermont.gov/about/policies/rpd/correctional-services-301-550/401-500-programs-security-and-supervision/410-01-facility-rules-and-inmate-discipline.pdf.

Reviewing cross-motions for summary judgment, the court held that, under the circumstances, "it was reasonable to confiscate the journal and there was no First Amendment violation." *Id.* at *3. The court reasoned that "[t]here is a valid, rational connection between confiscating prohibited property that contains threats and promoting order, safety, and security of a correctional facility." *Id.* (citing *Turner*, 482 U.S. at 89). The court noted that Macy had not presented any admissible evidence to support his assertion that the journal did not contain any threats, *id.* at *1 n.1, but that even if the journal only contained the language he said it did, that language could still be considered threatening and not entitled to protection under the First Amendment. *Id.* at *4.

The result is the same in this case. Here, there is no dispute that Thurston's journal contained threats of violence against correctional facility staff.[20] Like Macy, Thurston contends that the threatening language served a rehabilitative purpose. That argument did not persuade the court in *Macy*, nor is it persuasive here.[21] As the *Macy* court observed, prisoners are "free to keep a journal and write about any topic that is not threatening against facility staff members or . . . the security of the facility." *Macy*, 2014

---

[20] *Macy* was resolved on summary judgment, but in this case the fact that the Amended Complaint describes the explicit threat against staff in the journal makes this issue appropriate for resolution under Rule 12(b)(6).

[21] In his Opposition, Thurston asserts that eyeball-gouging statement was hypothetical, as evidenced by the preceding word "if." (Doc. 34 at 6.) However, the word "if" appears only in Thurston's summary of the journal's contents—it is unclear whether the language in the journal was couched as a hypothetical. In any case, even if it was, it would still constitute unprotected threatening language. Indeed, in *Macy* the prisoner also asserted that his journal only contained observations that "if" certain conduct by staff continued then more staff injuries would occur. *Macy*, 2014 WL 3709593 at *1 n.1. The *Macy* court concluded that "[e]ven if Mr. Macy's journal only contained the language he suggests, that language could be considered threatening by a reasonable officer." *Id.* at *4. The same is true in this case.

WL 3709593 at *4.  If Thurston has complaints about staff conduct or other conditions, the grievance procedure is available to him.  *See id.*[22]  Because I conclude that Thurston's writing about harming staff is not protected speech on the basis of its threatening nature, and that restricting speech about harming corrections staff is reasonably related to legitimate penological interests, I do not reach Defendants' additional argument (Doc. 30 at 12) that the speech is unprotected as "fighting words."

In addition to threats, Thurston's journal also contained a "jail break" story.  That is also not protected speech—certainly not where it was written in the first person and involved a Vermont correctional facility.  As one court has recently recognized, an inmate "does not retain any First Amendment free speech right to write, illustrate, or possess escape plans, however creative they may be, within the walls of the prison."  *Driskell v. Jones*, No. 2:11-CV-721-WKW, 2014 WL 4795048, at *10 (M.D. Ala. Sept. 25, 2014) (footnote omitted).  Finally, Thurston states in his Amended Complaint that his journal contained thoughts "about how to introduce contraband to a facility."  (Doc. 18 at 2.)[23]  For similar reasons, restricting speech about introducing contraband is "reasonably related to legitimate penological interests."  *Turner*, 482 U.S. at 89.

---

[22]  The *Macy* court also concluded that, even if Macy's journal was entitled to protection under the First Amendment, the defendants were entitled to qualified immunity because there was no clearly established law holding that prisoners have a First Amendment right to write threats against correctional staff in journals.  *Id.*  Defendants in this case do not raise the issue of qualified immunity in their Motion to Dismiss, so it is not discussed here.

[23]  Thurston apparently disputes that his journal contained any clear statement that he had received drugs several times by having them thrown over the fence.  (*See* Doc. 18 at 3.)  However Thurston also clearly states in his Amended Complaint that his journal did contain thoughts about how to introduce contraband to a facility.

### B.      First Amendment—Association

In his Amended Complaint, Thurston reiterates his claim that his address book was confiscated, violating his First Amendment right of association by causing him to lose contact with his friends.  (Doc. 18 at 4.)  The May 8, 2014 R&R discussed this claim in the context of Thurston's original Complaint, concluding that Thurston's freedom-of-association claim was insufficient because, under the sparse allegations of the original Complaint, it was "*possible* that DOC officials confiscated Thurston's list of addresses without any rational relation to legitimate penological interests" but that "possibility is not plausibility, and does not meet the Rule 12(b)(6) standard."  (Doc. 16 at 12.)

Thurston's Amended Complaint adds very few facts that might alter that earlier conclusion.  At best, Thurston appears to suggest that his address book was confiscated because DOC had erroneously concluded that he was "a threat" to some of the individuals listed in the address book.  (*See* Doc. 18 at 4.)  Thurston's assertion that he does not represent a threat to anyone in the address book is entirely conclusory; he presents no factual allegations regarding the basis (or lack thereof) for any determination that he was a threat, or any other reason the DOC advanced for confiscating the address book.  I therefore continue to conclude that Thurston has failed to state a First Amendment association claim under the Rule 12(b)(6) standard.

### C.      Fourteenth Amendment

Thurston's allegations, when read liberally, arguably implicate a variety of the Fourteenth Amendment's protections.  However, for the reasons discussed below, Thurston has failed to state any Fourteenth Amendment claim.

### 1.    Procedural Safeguards Prior to Segregation

As noted in the May 8, 2014 R&R (Doc. 16 at 13), "[d]ue process requires that prior to the imposition of disciplinary segregation, an inmate be afforded various procedural safeguards, including notice, pre-hearing assistance, a fair and impartial hearing officer, a reasonable opportunity to call witnesses and present documentary evidence, a written disposition, and a sentence supported by some reliable evidence." *Mitchell v. Senkowski*, 158 F. App'x 346, 349 (2d Cir. 2005) (citations omitted). The May 8, 2014 R&R concluded that Thurston's original Complaint contained no factual allegations on any of those issues. (Doc. 16 at 14.)

In his Amended Complaint, Thurston alleges that the hearing officer, Mandigo, was not impartial. (Doc. 18 at 3.) Specifically, Thurston states that he "believes" that Morley had "instructed" Mandigo to find in favor of administrative segregation. (*Id.*) He also alleges that Mandigo failed to receive Thurston's journal as evidence when Thurston had attempted to dispute Arkley's report that the journal recounted instances of Thurston receiving drugs by having them thrown over the fence. (*See id.*)

"[A]n impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say . . . how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). Here, Thurston's "belief" that Morley instructed Mandigo to find in favor of administrative segregation is conclusory

and ungrounded by any facts that might make such a belief plausible.[24]  Even if Morley did "instruct" Mandigo to find against Thurston, the bare fact that Mandigo ultimately did find against Thurston does not mean that Mandigo abandoned his duties as an impartial hearing officer.  *See Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) ("Administrators serving as adjudicators are presumed to be unbiased.").

Thurston's claim regarding Mandigo's failure to receive Thurston's journal as evidence also fails.  Mandigo was entitled to rely on Arkley's testimony regarding the contents of the journal.  *See Young v. Selsky*, 41 F.3d 47, 53 (2d Cir. 1994) (noting that prison disciplinary hearings are not "truly adversarial in nature," and often rely on hearsay).  Moreover, even if Thurston's journal did not in fact specifically recount instances of Thurston receiving drugs by having them thrown over the fence, Thurston does not deny that it contains his "general[]" thoughts about how to introduce contraband into the facility, or that it contains the threats discussed above.  (Doc. 18 at 2.)  Even if Arkley's report was incorrect about the journal's discussion of drugs being thrown over the fence, there was still more than "some evidence" to support Mandigo's ruling.  *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004).

In addition to his claim against Mandigo, Thurston also asserts that proof of a due process violation appears in Superintendent Davis's response to Thurston's

---

[24]  The Rule 12(b)(6) standard does not prevent a plaintiff from pleading facts "on information and belief" in appropriate circumstances.  *See Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008).  However, such allegations must still be "accompanied by a statement of the facts upon which the belief is founded."  *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 385 (S.D.N.Y. 2006) (internal quotation marks omitted).

August 22, 2013 inquiry, in which Davis stated that his office could find no appeal. (Doc. 18 at 3.)  To the contrary, the materials Thurston has submitted show that Davis acted on Thurston's inquiry and assigned an Assistant Superintendent to investigate. (Doc. 18-2 at 1.)  Davis's response was entirely appropriate.

In his Opposition, Thurston argues for the first time that DOC corrections officers serving as hearing officers can never be impartial because they are within the DOC "chain of command."  (Doc. 34 at 4, 7.)  That argument is unpersuasive.  As other courts have recognized, "[t]he fact that a hearing officer is a prison[] official is not enough to set forth a viable claim for a deprivation of due process claim based on an allegation of a bias where the disciplinary hearing officer was not involved with the underlying incident."  *Williams v. Benson*, Civil No. 11-1837 (SRN/JSM), 2012 WL 4449658, at *11 (D. Minn. June 27, 2012).

### 2.    Transfer to NWSCF

To the extent that Thurston is attempting to assert a procedural due process violation arising out of his September 2013 transfer from NSCF to NWSCF, he has also failed to state a claim.  As the Second Circuit has held, "[a]s a general rule, there is no constitutionally based liberty interest that entitles a prisoner to a hearing or any other safeguards before being transferred from one prison to another, absent a state law or regulation conditioning such transfer on proof of misbehavior or other specified events." *Matiyn v. Henderson*, 841 F.2d 31, 34 (2d Cir. 1988).  Here, Thurston has not identified any Vermont state law or regulation that conditions transfers on proof of misbehavior; even if there were such a law, there was ample proof of misbehavior as discussed above.

Thurston claims that Morley transferred him without Superintendent Davis's knowledge or approval.  DOC directives contemplate that facility superintendents be involved in certain types of transfers.  *See* "Interdepartmental Transfers," #313.01, available at http://www.doc.state.vt.us/about/policies/rpd/correctional-services-301-550/301-335-facilities-general/313.01%20Interdepartmental%20Transfers.pdf (requiring the sending superintendent to notify Central Office of completed program and security transfers within 24 hours).  Assuming that Thurston's was such a transfer, I cannot conclude that the superintendent's contemplated involvement in the process amounts to a state-created liberty interest that inmates not be transferred without that involvement. Rather, superintendents' involvement in transfers is an administrative duty, not a procedural safeguard for prisoners.

### 3.    Conditions of Confinement

Thurston claims that his treatment in segregation was unconstitutionally harsh. Analyzing Thurston's original Complaint—which only alleged 64 days of segregation and contained no allegations regarding the conditions of confinement—I previously concluded that Thurston had failed to implicate any liberty interest sufficient to state a due process conditions-of-confinement claim.  (*See* Doc. 16 at 14–16.)  In his Amended Complaint, however, Thurston claims that the DOC has used his journal to administratively segregate him three different times for a total of 268 days as of May 13, 2014.  (Doc. 18 at 3–4.)

An inmate has a liberty interest protected by procedural due process when his confinement subjects him to "'atypical and significant hardship . . . in relation to the

ordinary incidents of prison life.'"  *Colon v. Howard*, 215 F.3d 227, 230 (2d Cir. 2000)

(quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).  Here, Thurston alleges that he

was segregated for 268 days—a time of "intermediate duration" under *Palmer v.*

*Richards*, 364 F.3d 60, 65 (2d Cir. 2004).  To determine whether such segregation

implicated a liberty interest would require the development of a "detailed record of the

conditions of confinement relative to ordinary prison conditions." *Id.* (internal quotation

marks omitted).  However, even when a prisoner is subjected to such hardship, there is no

procedural due process violation unless the deprivation was the "result of insufficient

process." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (internal quotation marks

omitted).  As described above, Thurston received ample process prior to his segregation,

and his allegations of defects in that process are insufficient.  To the extent that Thurston

is alleging that his conditions of confinement amounted to cruel and unusual punishment,

I address that Eighth Amendment issue below.

### 4.     Seizure of the Journal and Address Book

To prevail on a procedural due process claim under § 1983 arising out of the

seizure of his journal and address book, Thurston must show that he "possessed a

protected . . . property interest, and that he was deprived of that interest without due

process." *McMenemy v. City of Rochester*, 241 F.3d 279, 286 (2d Cir. 2001) (internal

quotation marks omitted).  Here, Thurston received an administrative hearing regarding

the contents of his journal.  For the reasons discussed above, Thurston has failed to state a

claim of any constitutional infirmity in the process he received at that hearing.

To the extent that Thurston had any protected property interest in the journal, the confiscation was entirely justified after the determinations at the hearing concerning the journal's contents. Deprivation of the journal was "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. As the *Macy* court observed, "[t]here is a valid, rational connection between confiscating prohibited property that contains threats and promoting the order, safety, and security of a correctional facility." 2014 WL 3709593, at *3.[25]

To the extent that Thurston is asserting a Fourteenth Amendment violation for deprivation of any property interest in the address book, he has failed to state a claim for reasons similar to those discussed above regarding First Amendment freedom of association. Thurston has articulated almost no facts regarding the circumstances of the confiscation of his address book. I conclude that Thurston has not advanced any Fourteenth Amendment claim regarding the confiscation of his address book past the line separating possibility from plausibility.

---

[25] Nothing in this Report and Recommendation is intended to suggest that Thurston's failure to state a claim must necessarily result in the permanent loss of his journal, which Thurston says he values for use in writing a potential autobiography. (*See* Doc. 18 at 2.) I presume that the DOC will follow its usual procedures for the disposition of inmate property. *See generally* State of Vermont, Agency of Human Services Department of Corrections, "Offender/Inmate Property," #321.01, § 11 (eff. Dec. 6, 2010), *available at* http://www.doc.state.vt.us/about/policies/rpd/correctional-services-301-550/301-335-facilities-general/321-01-offender-inmate-property; State of Vermont, Agency of Human Services Department of Corrections, "Interim Procedure on Contraband Classification and Disposition," § 6(i) (eff. Mar. 18, 2006), *available at* http://www.doc.state.vt.us/about/policies/rpd/interim-and-memo/Interim%20Procedure%20Contraband.3.18.06.pdf.

**D.**     **Eighth Amendment**

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.'" *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "A deliberate indifference claim contains two requirements. The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Id.* (internal quotation marks omitted). "The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Id.*

Here, Thurston makes a variety of allegations that appear to be attempts at deliberate-indifference claims. First, Thurston asserts that his transfer to NWSCF put him "in a more severe than normal lock down" because he was not allowed to self-inject his insulin at NWSCF. (Doc. 18 at 2.) Diabetes—presumably the condition for which Thurston was prescribed insulin—is undoubtedly a serious medical condition. *See Beatty v. Davidson*, 713 F. Supp. 2d 167, 174 (W.D.N.Y. 2010). Of course, the Eighth Amendment analysis focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

Here, assuming that Thurston's risk of harm from missing the insulin injections was objectively sufficiently serious, Thurston cannot show that any Defendant was subjectively reckless. Thurston does not allege that he was deprived of medication necessary for the treatment of his condition; rather, he alleges that he was deprived of the

opportunity to inject that medication himself.  Treatment was available—just not under the circumstances that Thurston wanted; the missed insulin injections were a result of Thurston's own denial of treatment, not any subjective recklnessness.  *See Wilson v. Ritchie*, No. 05-CV-6616 CJS, 2009 WL 290446, at *4 (W.D.N.Y. Feb. 5, 2009) (plaintiff who was offered an insulin injection but refused it failed to demonstrate a triable issue of fact as to the defendants' subjective state of mind).

At most Thurston has alleged a disagreement over proper treatment—i.e., whether or not he should be permitted to administer the treatment himself.  That is insufficient to state an Eighth Amendment claim.  *See Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("[M]ere disagreement over the proper treatment does not create a constitutional claim.").  Thurston also appears to claim that, by characterizing his emergency grievance regarding his insulin as "not an emergency," Defendant Reed was deliberately indifferent to Thurston's serious medical needs, resulting in his hospitalization.  (*See* Doc. 18 at 3.) That claim fails for the same reason.  According to the Amended Complaint, the insulin was available to Thurston as long as he consented to allow staff to administer it.

Thurston explains his position with somewhat greater detail in his Opposition.  He asserts that his objection is to "being forced to allow others to inject you four times a day" when the individuals "doing the injecting treat you like an unwanted piece of live[]stock."  (Doc. 34 at 6.)  Thurston states: "I never refused my insulin.  I refused to allow others to inject me and treat me with no dignity."  (*Id.* at 6–7; *see also id.* at 10 ("I was not afforded the dignity of a human being.  I never refused my medication, I did refuse to be injected by callous unfeeling medical person[n]el.").)  Of course the Eighth

Amendment "means that prison officials must accord human dignity to each individual inmate." *Kaminsky v. Rosenblum*, 929 F.2d 922, 926 (2d Cir. 1991). However, Thurston points to no authority—and I have found none—establishing that the "human dignity" guaranteed to inmates includes the right to self-inject their own medications. Not every "indignity" that a prisoner perceives is a deprivation of "human dignity" in the constitutional sense. *See Jones v. Schouppe*, Civil Action No. 06-1083, 2008 WL 163049, at *4 (W.D. Pa. Jan. 15, 2008) (describing certain indignities "incidental to prison life" as not sufficiently serious to rise to the level of Eighth Amendment violations). What the Eighth Amendment does prohibit is, among other things, deliberate indifference to serious medical needs. For the reasons discussed above, there was no such deprivation in this case.

In addition to his claim regarding insulin injections, Thurston alleges that when he returned from the hospital ICU, he was placed in a cell wearing only boxers. (Doc. 18 at 3.) I conclude that this claim fails on the first prong of the Eighth Amendment analysis because the alleged deprivation is not "sufficiently serious." Thurston does not allege the length of the deprivation,[26] whether the temperature in his cell made the deprivation of clothes dangerous,[27] nor does he allege that he was deprived of "the minimal civilized measure of life's necessities" during that time. *Farmer v. Brennan*, 511 U.S. 825, 834

---

[26] In his Opposition Thurston alleges that it was for two days. (Doc. 34 at 3.)

[27] The Second Circuit has held that being "kept virtually naked for a prolonged period in bitter cold . . . would jeopardize an inmate's health or safety." *Trammell v. Keane*, 338 F.3d 155, 164 (2d Cir. 2003) (internal quotation marks omitted). Here, similar to *Trammell*, Thurston makes no allegation of such exposure to cold weather.

(1994) (internal quotation marks omitted).  Other courts have concluded that similar

claims fail for precisely that reason.  *See Abascal v. Hilton*, No. 9:04-CV-1401

(LEK/GHL), 2008 WL 268366, at *12 (N.D.N.Y. Jan. 30, 2008) (incarceration in a "strip

cell" for five days with only underwear and a mattress not "sufficiently serious").

Finally, in his Opposition, Thurston alleges for the first time that the cell into

which he was placed after returning from the hospital featured "bright" lights that were

always on.  (Doc. 34 at 3.)  Generally, "[t]he decisions evaluating Eighth Amendment

claims based on continuous lighting in the prison setting are very 'fact-driven,' turning on

the degree of illumination, the duration of the inmate's exposure, the extent of harm it

causes, and the penological justification for the lighting."  *Quick v. Graham*, No. 9:12-

CV-1717 (DNH/ATB), 2014 WL 4627108, at *9 (N.D.N.Y. Sept. 11, 2014); *see also*

*McGee v. Gold*, No. 1:04-CV-335, 2010 WL 5300805, at *5 (D. Vt. Aug. 3, 2010)

("[T]he inquiry with respect to whether constant security lighting in prison cells violates

the Eighth Amendment is necessarily fact-specific."), *adopted sub nom.*, *McGee v.*

*Pallito*, 2010 WL 5389996 (D. Vt. Dec. 20, 2010), *vacated and remanded on other*

*grounds sub nom.*, *Kimber v. Tallon*, 556 F. App'x 27 (2d Cir. 2014).  Here, I conclude

that even if Thurston had included his illumination assertion in a pleading, he would still

fail to state a claim.  Thurston himself states that the continuous lighting lasted only two

days, (Doc. 34 at 3), and he does not allege any harm resulting from the lighting.

### E.      HIPAA

In his Opposition, Thurston claims for the first time that Defendants Arkley and

Morley violated the Health Insurance Portability and Accountability Act of 1996

(HIPAA).  (Doc. 34 at 4.)  Thurston appears to claim that his journal constituted

protected health information under HIPAA and that Arkley and Morley were not

authorized under HIPAA to read the journal or disseminate its contents.  However,

provisions within HIPAA authorize disclosures when necessary to preserve inmate and

staff health and safety.  *See* 45 C.F.R. § 164.512(k)(5).  Even if there were a HIPAA

violation, Thurston could not bring a cause of action under HIPAA because there is no

private cause of action under HIPAA.  *See Warren Pearl Constr. Co. v. Guardian Life*

*Ins. Co. of Am.*, 639 F. Supp. 2d 371, 377 (S.D.N.Y. 2009) (citing cases).  Neither could

any alleged HIPAA violation support a § 1983 claim.  *See O'Neil v. Bebee*, No. 5:09-CV-

1133 (GTS/DEP), 2010 WL 502948 at *9 n.17 (N.D.N.Y. Feb. 10, 2010) (citing cases).

## VI.    Leave to Amend

The Second Circuit has cautioned that district courts should not dismiss *pro se*

complaints with prejudice without granting leave to amend at least once "'when a liberal

reading of the complaint gives any indication that a valid claim might be stated.'"  *Chavis*

*v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (quoting *Branum v. Clark*, 927 F.2d 698,

705 (2d Cir. 1991)); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should free give leave

[to amend] when justice so requires.").  Nonetheless, leave to amend may be denied in

certain circumstances, including futility or "repeated failure to cure deficiencies by

amendments previously allowed."  *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d

Cir. 2008) (internal quotation marks omitted).

Here, Thurston has already had one opportunity to cure deficiencies in his

pleadings.  His Amended Complaint adds some new Defendants and some new facts, and

it appears that with additional allegations he might be able to rectify some of the deficiencies with respect to personal involvement.  However, for the reasons discussed above, Thurston still fails to state any claim.  I therefore conclude that leave to amend should be denied because amendment would either be futile or is barred by Thurston's failure in his Amended Complaint to cure deficiencies in the original Complaint. Accordingly, I recommend that the court deny Thurston leave to amend.

## VII.   State-Law Claims

In his original Complaint, Thurston alleges that he should be compensated for his "mental anguish"—arguably a state-law tort claim for intentional or negligent infliction of emotional distress.  (Doc. 4 at 4.)  In his Amended Complaint, Thurston seeks damages for the three days he spent in the ICU—arguably some species of state-law negligence claim.  (Doc. 18 at 4.)  Regarding any such state-law claims, I recommend that the court decline to exercise supplemental jurisdiction over any state-law claims pursuant to 28 U.S.C. § 1367(c)(3).

### Conclusion

For the reasons set forth above, I recommend that Defendants' Motion to Dismiss (Doc. 30) be GRANTED, that Thurston's § 1983 claims against all Defendants be DISMISSED, and that any state-law claims Thurston is alleging against Defendants be DISMISSED without prejudice.

Dated at Burlington, in the District of Vermont, this 13th day of January, 2015.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation. *See Fed. R. Civ. P. 72(a); Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).